# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
| --- | --- | --- |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | No. 18-270 |
| SALIM DAVIS | : | |

## **MEMORANDUM**

PRATTER, J.                                                                                                                DECEMBER 6, 2018

Off-duty police officer Inspector Verdell Johnson heard loud bangs and then saw two men carrying guns walk past him. He followed the men as he called for back-up. Inspector Johnson lost sight of the men momentarily but doubled back and, along with the back-up that arrived, eventually seized them. Salim Davis is allegedly one of the two men Inspector Johnson saw carrying firearms that day, namely December 29, 2017. Mr. Davis is accused of making false statements to a federal firearms licensee, possession of a firearm and ammunition by a felon, possession with intent to distribute a controlled substance, and possession of a firearm in furtherance of a drug transaction.

Mr. Davis now moves to suppress all of the physical evidence retrieved that day, the buccal swab that was later obtained with a warrant, and any statements he made to police following the arrest. He alleges that Inspector Johnson and the other officers lacked any reasonable suspicion to stop him and that the subsequent search that netted cash and drugs was outside the bounds of a legal *Terry* stop.

The Government also moves to admit four audio recordings and the resulting transcripts under Federal Rules of Evidence 104 and 901.

Following an evidentiary hearing and oral argument, and upon review of the briefing and applicable case law, the Court denies Mr. Davis' motion to suppress and grants the Government's motion to admit audio recordings.

**FINDINGS OF FACT**

The Court finds the following facts based on evidence presented at the evidentiary hearing.

At approximately 3:25 p.m. on December 29, 2017, off-duty Inspector Verdell Johnson was driving down the rear alleyway that runs behind of the 2500 block of Island Avenue when he encountered a trash bag obstructing his path. Inspector Johnson, a 30-year veteran of the Philadelphia Police Department, got out his unmarked police vehicle to move the bag. As he was getting back into his car, Inspector Johnson heard a loud noise, followed by several more, which he recognized as gunshots. Inspector Johnson looked in the direction of the noise and saw two black men, holding firearms, aiming down Theodore Street towards Island Avenue.

Inspector Johnson quickly backed his vehicle into a parking spot and watched as the two men, later identified as defendant Salim Davis[1] and Jamar Crawford, walked down the rear alleyway carrying guns. Mr. Davis was dressed in black clothing and Mr. Crawford was in a gray hoodie and gray sweatpants. Inspector Johnson waited until the two men passed him before radioing for back-up. When the two men reached the end of the street, he followed them as they crossed Buist Avenue and then turned east on Berbro Street. The men finally turned onto the 7300 block of Garman Street; Inspector Johnson continued on Buist Avenue and turned east on Bialy Street so that the men would not recognize that they were being followed. As he passed the 7300

---

[1] Although Inspector Johnson did not immediately recognize Mr. Davis, he later recognized him as a prior shooting victim known to him from previous events.

block of Garman Street, Inspector Johnson saw the two men walking down an otherwise empty street.

As Inspector Johnson was travelling on Bialy Street, he saw uniformed officers, Harvel Brown and Allan Wells from the 12th District, in a marked police vehicle, turn onto Garman Street. Inspector Johnson turned his car around and headed back towards the 7300 block of Garman Street where he immediately recognized the two men from the alleyway who were now on the porch of one of the homes. Mr. Crawford was sitting on a bench on the porch while Mr. Davis was knocking on the door of the home. Inspector Johnson estimates that the men were out of his sight for roughly 30 seconds while he was driving down Bialy Street.

Inspector Johnson watched the marked police vehicle pass the two men. He parked in front of the home where the suspects were and got out of his vehicle. Inspector Johnson drew his weapon and announced himself as a police officer before commanding the two men to stop moving and put their hands up. At this point, Officer Brown, the passenger in the marked police car, arrived with his gun drawn to assist.

Mr. Davis put his hands up and began walking down the steps of the home repeatedly stating that "they were shooting at us" while taking off his jacket and dropping it on the steps. Inspector Johnson told Mr. Davis to stop speaking or he would "meet God" that day. Once Mr. Davis reached the bottom of the steps, Officer Wells placed him in handcuffs and conducted a pat-down. Officer Wells felt a bulge in Mr. Davis' pocket, which he says he thought might be a weapon. Instead, he recovered $1,038 in United States' currency, a clear orange pill bottle with no label that was later determined to contain a bag with 72 pills of Alprazolam (Xanax), and 7 ½ additional loose pills of Alprazolam. Officer Wells also noticed that Mr. Davis was wearing a silver locket, which he says made a rattling noise. Based on his training, Officer Wells believed

3

that the locket could contain some type of weapon or a "cuff key" and decided to check the locket, which contained additional pills.

Officer Brown recovered the black jacket Mr. Davis shed as he descended the stairs. Officer Brown says that the jacket felt heavier than a normal jacket, which caused him to go through the pockets. In the left jacket pocket, he found a black and silver .40 caliber Smith and Wesson semi-automatic handgun loaded with 10 live rounds. The officers then searched the area for the other handgun and found a .40 caliber black Berretta handgun loaded with nine live rounds in an open trash bag in front 7327 Garman Street.

Meanwhile, other officers searched the original scene in the alleyway behind the 2500 block of Island Avenue. They recovered four shell casings from a Smith and Wesson Speer .40 caliber.

Later that day, the officers obtained a warrant for Mr. Davis' DNA via a buccal swab and tested that DNA against the recovered evidence. The DNA analysis revealed that Mr. Davis' DNA was on the Smith and Wesson firearm and also the black jacket from which the firearm was recovered.

## DISCUSSION

Today, the Court addresses two outstanding motions in this case. First, the Court will consider Mr. Davis' motion to suppress evidence obtained as a result of his interactions with police on December 29, 2017. Then, the Court will review the Government's motion to admit audio recordings and the transcripts.

### I. Motion to Suppress

Mr. Davis moves to suppress all physical evidence obtained as a result of his interactions with the police on December 29, 2017, including a firearm, prescription pill bottle and pills, currency, clothing, the locket with pills, and buccal swab. He alleges that these items were secured

as the result of an illegal seizure, arrest, and search because Inspector Johnson did not have a "reasonable, articulable suspicion that criminal activity was afoot by this particular defendant" and, therefore, lacked a justification to stop Mr. Davis. Mot. to Suppress at p. 7 (Doc. No. 20). Mr. Davis also moves to suppress any statements he allegedly made to the police following his arrest. The Court denies the motion because the officers had reasonable suspicion, at the very least, to stop Mr. Davis under *Terry v. Ohio*, 392 U.S. 1 (1968).

Generally, the Fourth Amendment prohibits "unreasonable searches and seizures" unless a warrant based upon probable cause is issued. U.S. Const. amend. IV; *see also United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008). "Under the exception to the warrant requirement established in *Terry,* however, 'an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Torres*, 534 F.3d at 210 (quoting *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000)). This requires that a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21; *see also Torres*, 534 F.3d at 210.

"A person is seized for *Terry* purposes when, taking into account all of the circumstances surrounding the encounter, the police conduct would . . . communicate to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (internal citations and quotations omitted)). Not every encounter with law enforcement amounts to a seizure; however, an interaction becomes a seizure when "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 436 (1991); *see also Campbell*, 332 F.3d at 205. "Examples of circumstances that might indicate a seizure . . . would be the threatening presence

of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Inspector Johnson seized Mr. Davis when, with his gun raised, Inspector Johnson ordered Mr. Davis to step off the porch and submit to his authority and Mr. Davis submitted to that authority. *See infra* p. 6–7. The question in this case focuses on whether Inspector Johnson had "a reasonable, articulable suspicion that criminal activity is afoot" to effectuate that seizure. *Wardlow,* 528 U.S. at 123.

### A. *Mr. Davis Abandoned the Gun before He Was Seized*

In addition to the other items, Mr. Davis moves to suppress the firearm obtained from the jacket he dropped on the stairs. The gun was lawfully obtained because Mr. Davis had abandoned it before he himself was seized. A seizure only occurs when the defendant complies with the officer's show of authority. *California v. Hodari D.*, 499 U.S. 621, 629 (1991).

In *Hodari D.*, the Court found that the suspect was not seized when the officer was running towards him, making an initial show of force. *Id.* The suspect began running and tossed away an item that appeared to be a small rock, which turned out to be cocaine, as he ran and the officer gave chase. *Id.* at 623. A moment later, the officer tackled and handcuffed the suspect. *Id.* The Court concluded that the suspect was not seized until the officer tackled him because the suspect did not comply with the officer's initial "show of authority." *Id.* at 629. And, because the suspect "abandoned" the cocaine before he was seized, it was not the fruit of an otherwise allegedly illegal seizure. *Id.*

In this case, Inspector Johnson had his gun raised as Mr. Davis descended the stairs to the street. Although Inspector Johnson told Mr. Davis to stop moving, Mr. Davis continued down the steps speaking loudly and saying that "they were shooting at us." He removed his jacket,

6

containing the gun, while he was moving down the steps. Mr. Davis did not stop moving, and was not seized, at least until Inspector Johnson said he would "meet God" if Mr. Davis continued down the stairs.

Because the defendant abandoned the gun before he was seized, it will not be suppressed.

### B. *Inspector Johnson was Reasonable to Suspect Mr. Davis of Criminal Activity*

Mr. Davis alleges that there are "serious discrepancies" in Inspector Johnson's narrative of events that made it unreasonable for him to suspect Mr. Davis of criminal behavior. Mot. to Suppress at p. 8. In particular, Mr. Davis notes that Inspector Johnson did not see Mr. Davis fire shots or engage in evasive behavior, and he notes contradictions in the record about (1) the route the two men travelled, (2) whether Inspector Johnson lost sight of the two men before seizing Mr. Davis, and; (3) descriptions of Mr. Davis' black and silver gun. He contends that all these supposed discrepancies go towards Inspector Johnson's credibility.

The Court found Inspector Johnson's testimony credible and concludes he articulated specific, sensible reasons for Mr. Davis' detention. *Campbell*, 332 F.3d at 206 ("The ultimate question is whether a reasonable, trained officer standing in [the officer's] shoes could articulate specific reasons justifying [the suspect's] detention."). Inspector Johnson said that he witnessed Mr. Davis with a gun, which in and of itself amounts to reasonable suspicion. *United States v. Cooper*, 293 F. App'x 117, 119 (3d Cir. 2008) (citing *Commonwealth v. Romero,* 673 A.2d 374, 377 (Pa. Super. Ct. 1996); *Commonwealth v. Robinson,* 600 A.2d 957, 959 (Pa. Super. Ct. 1991)) ("But Pennsylvania courts have consistently held an officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation.").

Inspector Johnson testified he heard gunshots and turned to see two males holding guns. Inspector Johnson quickly pulled into a parking spot before the two men, Mr. Davis being one,

walked past him still holding guns. He waited until the two men were past him and then followed them out of the rear alleyway behind Island Avenue, as they crossed Buist Avenue and turned onto Berbro Street. He then watched as they finally turned onto the 7300 block of Garman Street. Inspector Johnson also testified that it was very cold that day and the two men were the only people out on the street. Inspector Johnson admits that he lost sight of the men for roughly 30 seconds but also says that they were still the only pedestrians on Garman Street when he circled back around. Inspector Johnson recognized the two men before he got out of his vehicle and announced himself as a police officer.[2]

If there are factual discrepancies that cast doubt on Inspector Johnson's story, Mr. Davis is free to present those discrepancies to the jury, in keeping with evidence rules and appropriate trial conduct. At this stage, however, the Court is persuaded that Inspector Johnson was reasonable in his suspicion that Mr. Davis was engaged in criminal activity. Indeed, Inspector Johnson saw Mr.

---

[2] Although the police officers used handcuffs on Mr. Davis, that did not automatically elevate the incident to an arrest requiring probable cause. Officers may use "a reasonable amount of force" in effectuating a valid *Terry* stop. *United States v. Bonner*, 363 F.3d 213, 217 (3d Cir. 2004). "There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995); *see also United States v. Burney*, 35 F. App'x 354, 355 (3d Cir. 2002); *United States v. Slone*, No. 16-400, 2017 WL 1042074, at *4 (E.D. Pa. Mar. 17, 2017) (concluding that the officer's use of guns and handcuffs on a defendant they believed to be armed did not convert a *Terry* stop to a custodial arrest because it was objectively reasonable to protect the officers' safety). The use of such tactics, however, must be justified under the circumstances. *Id.*

In this case, Inspector Johnson believed Mr. Davis was armed. As Mr. Davis descended the porch stairs, Inspector Johnson told him to stop moving but Mr. Davis continued descending while simultaneously taking off his jacket and dropping it on the ground. It was reasonable for the officers to believe that Mr. Davis was still armed and dangerous given that Inspector Johnson previously saw him with a gun. Therefore, the use of weapons and handcuffs was in line with a *Terry* stop.

There is also case law to indicate that, even if this was an arrest, the officers had probable cause. Under Pennsylvania law, it is illegal for a person to carry a firearm on the public streets or public property in Philadelphia unless the person has a license or is exempt from having a license. 18 PA. CONST. STAT. § 6108. A "police officer has probable cause to arrest an individual for violation of section 6108 based solely on the officer's observation that the individual is in possession of a firearm on the streets of Philadelphia." *United States v. Bond*, 173 F. App'x 144, 146 (3d Cir. 2006); *see also Sloane*, 2017 WL 1042074, at *5. And, because having a license is an affirmative defense that is raised by the defendant, the Government need not prove that the defendant did not have a license before making the arrest. *Bond*, 173 F. App'x at 146.

8

Davis with a gun and followed him until back-up arrived. Inspector Johnson only seized Mr. Davis after recognizing him and Mr. Crawford as the men with guns he saw earlier in the alley behind Island Avenue. Inspector Johnson was very reasonable in his suspicion that Mr. Davis was carrying a weapon in public – because he had in fact seen Mr. Davis carry a weapon in public.

### *C. Officer Wells' Search of Mr. Davis Was Reasonable*

Mr. Davis also alleges that the officers unlawfully seized the drugs and currency because none of the items could reasonably feel like a weapon or immediately be recognized as contraband from a pat-down of his person. "Assuming that an officer is authorized to conduct a *Terry* search at all, he is authorized to assure himself that a suspect has no weapons." *United States v. Yamba*, 506 F.3d 251, 259 (3d Cir. 2007). Under *Terry*, the "scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible." *Terry*, 392 U.S. at 19 (internal quotation marks omitted). A search under *Terry* does not give the officer free rein to search until he finds evidence of a crime but, instead, "to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972). "So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Adams*, 407 U.S. at 146 (internal footnote omitted).

"As the Supreme Court has said, precedent has 'come to reflect the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately.'" *Yamba*, 506 F.3d at 256 (quoting *Texas v. Brown*, 460 U.S. 730, 739 (1983)). In *Minnesota v. Dickerson*, the Court extended the so-called "plain view" doctrine and considered the "plain feel" doctrine. 508 U.S. 366 (1993). The Court concluded that, if "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy

9

beyond that already authorized by the officer's search for weapons[.]" *Id.* at 375. And, "if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id.* at 375–76.

This means that an officer can slide and manipulate the object in the suspect's pocket until the officer is reasonably sure that the object is not a weapon. *Adams*, 407 U.S. at 146. "If, before that point, the officer develops probable cause to believe, given his training and experience, that an object is contraband, he may lawfully perform a more intrusive search." *Id.* "If, however, the officer 'goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed.'" *Id.* (quoting *Dickerson,* 508 U.S. at 373).

Ultimately, the Court must consider whether Officer Wells' search of Mr. Davis was within the bounds of a *Terry* stop. This requires the Court to look at whether Officer Wells could have reasonably believed that the pill bottle, lump of cash, and necklace contained weapons or, within the course of searching for a weapon, he reasonably believed the item to be contraband. Because Officer Wells only testified that he believed each item might be a weapon or cause harm in some way, and not that it might be another form of contraband, the Court will only consider that question.

*1. Pill Bottle and Currency*

In this case, Officer Wells escorted Mr. Davis down the stairs, placed him on the ground, and put him in handcuffs. Then he conducted a pat down search. He testified that he felt a solid object in Mr. Davis' pocket and initially was not sure what the object was. He believed, based on his training, that it could be a firearm or weapon of some kind, but ultimately "did not know what it could have been." After he pulled the object out, he found that it was a translucent orange prescription pill bottle with no label that contained pills inside. As Officer Wells continued the search, he felt another lump in Mr. Davis' pocket that felt like a "mass." Again, he could not say for certain what the mass was but believed it might be a weapon of some kind. That item turned

out to be a "crumpled-up mass" of roughly a thousand dollars in U.S. currency. It was only when Officer Wells escorted Mr. Davis to the patrol car that he noticed a gun sitting on top of Mr. Davis' jacket on the stairs, although he did not know who recovered the gun.

Based on his testimony, Officer Wells believed that the pill bottle and cash might be weapons. He testified that they were hard objects that could either be or contain weapons that could be used to injure the officers. Mr. Davis contends that this belief was unreasonable because a pill bottle and lump of cash inherently could not have felt like a gun. The Court agrees that it is unlikely Officer Wells could have believed the items were a gun in some conventional shape or heft but Officer Wells did not testify that he believed the items were a gun. Instead, he said that he thought they might be "a weapon of some kind." *Terry* allows officers to search for anything that may cause harm, which does not limit them to looking for a gun.

Case law also supports the idea that hard, bulky objects in pockets can reasonably be mistaken for a weapon. *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995) (concluding that the officer could have mistaken the feel of an envelope filled with credit cards with a small-caliber gun in its holster); *United States v. Thach*, 411 F. App'x 485, 489 (3d Cir. 2011) (declining to suppress cash after the officer testified that he believed the "hard, bulky object" in the suspect's pocket could have been a small handgun sheathed in a square, leather holster); *United States v. Gardner*, No. 12-217, 2013 WL 5918313, at *11 (W.D. Pa. Nov. 1, 2013) (finding the officer's testimony that he could not rule out the possibility that the items he found in a suspect's pocket could have been used "to harm him or the other officers"). In this case, Officer Wells manipulated the objects in Mr. Davis' pocket and, unable to conclude what the objects were or whether they presented danger, he removed them from the pocket. Only then was he certain that the pill bottle and cash did not contain weapons. The officer's manner of testifying and his actual testimony do

not strain credulity in the overall context of the descriptions provided to the Court. The Court will not suppress these items.

   *2. Necklace*

After Officer Wells seized the pill bottle and cash, he noticed Mr. Davis' necklace, which was a silver locket about one and a half inches in diameter, because it made a noise as though something was inside. Officer Wells was not sure what was inside the locket but believed it might contain something like a cuff key or another item that might cause harm.[3] Mr. Davis contends that, even if the necklace had contained a weapon or cuff key, the Court should analogize to the jurisprudence surrounding searches incident to arrest and conclude that there was no way Mr. Davis could have reached or accessed the necklace.

In the context of a search incident to arrest, the Third Circuit Court of Appeals has stated that police officers can only seize evidence so long as there is a "reasonable possibility" the arrestee may access a weapon or destroy evidence. *United States v. Matthews*, 32 F. App'x 211, 218 (3d Cir. 2013). Courts "are to assume that [the suspect] was neither an acrobat nor a Houdini" in making that determination. *United States v. Myers*, 308 F.3d 251, 267 (3d Cir. 2002) (cleaned up). In *Matthews*, the court reasoned that the suspect could not have possibly accessed a backpack at the time the officer executed a search because the suspect was handcuffed and locked in the back of a police car. 32 F. App'x at 218.

Mr. Davis argues that he was similarly restricted from reaching his own necklace in this case. However, the key difference here, as compared to *Matthews*, is that the necklace was on Mr. Davis' person, and therefore within his immediate control. *United States v. Bennett*, No. 08-535,

---

[3] Because the Court finds believes Officer Wells was reasonable in believing the necklace could contain a cuff key, the Court will not address whether the necklace could reasonably have contained a weapon.

2010 WL 1427593, at *6 (E.D. Pa. Apr. 8, 2010) ("Because this Court assumes Bennett is neither an acrobat nor a Houdini, Officer Harris's search of the backpack at this point was not a valid search incident to arrest because the backpack was no longer within Bennett's immediate control."). Although it may not have been likely that Mr. Davis would reach for his necklace, the Court will not discount the possibility that he could because these items were on his person. And, because Officer Wells testified that he heard a noise coming from internal the necklace when it moved that he believed could be a cuff key, it was reasonable that he looked inside the locket. It will not be suppressed.

   3. *Buccal Swab*

The buccal swab containing Mr. Davis' DNA was obtained after a magistrate judge issued a warrant based on a probable cause affidavit. Mr. Davis asks the Court to suppress the DNA as the fruit of an illegal search. He argues that the evidence that made up the probable cause determination was premised on the encounter from December 29, 2017, discussed in detail above. Because the Court concluded that the items were obtained lawfully, the Court declines to second-guess the magistrate judge's probable cause determination; and, hence, will not accept the challenge to the buccal swab.

   4. *Statements*

Mr. Davis also moves to suppress "all statements he allegedly made to police following his arrest." Mot. to Suppress at p. 2. This argument appears to be premised on the notion that the police officers lacked the reasonable suspicion to conduct a *Terry* stop and subsequently lacked the probable cause to arrest Mr. Davis. As detailed above, this notion is incorrect.

In the event that Mr. Davis also seeks to suppress the statements that he made to police before he was seized, the motion is also denied. As Mr. Davis descended the stairs and removed his jacket, the officers testified that he repeatedly stated, "they were shooting at us." H'rg. Tr.

13

56:23; 62:17. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966); *see also Arizona v. Mauro*, 481 U.S. 520, 529 (1987). "[A]bsent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Oregon v. Elstad*, 470 U.S. 298, 314 (1985); *see also Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment[.]"); *United States v. Kiam*, 432 F.3d 524, 531–32 (3d Cir. 2006).

Mr. Davis does not assert that the police officers coerced the statements he made as he descended the steps. These were entirely voluntarily utterances and are admissible.

## II. Government's Motion to Admit Audio Recordings

The Government seeks to admit four conversations, and their accompanying transcripts, that were recorded while Mr. Davis was incarcerated at the Curran-Fromhold Correctional Facility in addition to recordings from police dispatch on the day of Mr. Davis' arrest. At the hearing held on this matter, Mr. Davis agreed not to challenge the authenticity of the police dispatch recordings but requested that the Government lay out the authenticity for the recordings made at the correctional facility. H'rg. Tr. 4:21–5:10.

In *Starks v. United States*, the Court of Appeals for the Third Circuit stated that "the burden is on the government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings." 515 F.2d 112, 121 (3d Cir. 1975) (internal citations and quotations omitted). It articulated eight factors to authenticate tape recordings:

1. The recording device used was capable of accurately recording the conversations;

2. The operator of the recording device was competent;

3. The tape recordings are authentic and correct;

14

4. There have been no changes in, additions to, or deletions from the tape recordings;

5. The tape recordings have been properly preserved;

6. The speakers on the tape recordings are properly identified;

7. The conversations were lawfully intercepted pursuant to an application made and order issued under 18 U.S.C. § 2518 or through the consent of one of the parties. Copies of the application and order have been provided to the defendant in accordance with 18 U.S.C. § 2518(9); and

8. The transcripts of the tape recordings accurately represent the English language translation of the conversations on the tape recordings and accurately identify the speakers and parties to the tape-recorded conversations.

*Starks,* 515 F.2d at 121 n.11.

*Starks*' application, however, is less critical in light of Federal Rule of Evidence 901, which was issued after that decision. *See United States v. Tahn Le*, 542 F. App'x 108, 117 n.9 (3d Cir. 2013) (Rendell, J.) ("It is unclear whether *Starks* remains relevant after the enactment of Fed. R. Evid. 901."); *United States v. Kaboni*, No. 07-550-03, 2013 WL 420334, at *2 n.5 (E.D. Pa. Feb. 4, 2013) ("There has been uncertainty as to whether Congress' adoption of the Federal Rules of Evidence and, specifically Rule 901, abrogated *Starks*."). Rule 901 states that, to authenticate an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).

In this case, Mr. Davis contends that there is some uncertainty as to whether he is, in fact, the speaker on the recordings from the correctional facility. "The burden for identifying a speaker on a recording differs from the burden for the admission of tape recordings generally." *Kaboni*, 2013 WL 420334, at *4. By way of example, the Federal Rules of Evidence state that an "opinion identifying a person's voice–whether heard firsthand or through mechanical or electronic transmission or recording–based on hearing the voice at any time under circumstances that connect

15

it with the alleged speaker." Fed. R. Evid. 905(b)(5). Indeed, courts within the Third Circuit, including this Court, "have held that the Government need only present evidence sufficient to convince a reasonable jury by a preponderance of the evidence that the alleged speaker is the speaker in order to permit a jury to hear the tape recording." *United States v. Estevez*, No. 13-0020, 2013 WL 3196421, at \*2 (E.D. Pa. June 25, 2013) (citing *United States v. Tubbs,* No. 89–498, 1990 WL 27365 (E.D. Pa. Mar. 14, 1990)). Courts generally apply the *Starks* factors to determine the authenticity of a tape recording and use a preponderance of the evidence standard to identify a speaker on the recording. *Estevez*, No. 13-0020, 2013 WL 3196421, at \*2; *Tubbs,* No. 89–498, 1990 WL 27365, at \*3; *Kaboni*, No. 07-550-03, 2013 WL 420334, at \*4–5.

Two witnesses testified at the *Starks* hearing in this matter.

First, Bradley Cakrane testified as to his role as Systems Administrator for the Philadelphia Prisons System. Mr. Cakrane oversees the phone system that stores all inmate phone calls and responds to subpoenas for call records, such as in this case. He testified that all inmates are expressly informed that calls are being recorded in three ways: the inmate handbook, signs by telephones, and via a recording when they make a phone call. Inmates are assigned a unique inmate number (called a PP number) that they use for almost everything in the prison, including to make phone calls. An inmate places a call by dialing his PP number and then dialing a three-digit PIN number. The inmate chooses his PIN number in advance and can only change it by submitting a request, although doing so is a "big process" and can take up to 30 days to take effect. Inmates are only allowed to call a maximum of five telephone numbers that are allowed to be on their "call list," not including their attorney.

Mr. Cakrane also testified that, although he did not make the disk containing the recordings of the calls in this case, he reviewed the recording work product as a supervisor. He further

16

testified that the recording device used was capable of accurately recording the conversation, the operators of the device were competent, the recordings were authentic and correct, no changes, additions, or deletions were made, and the recordings were accurately preserved. Lastly, Mr. Cakrane confirmed that the recordings were made when Mr. Davis was an inmate at CFCF and were of calls made using Mr. Davis' PP number.

Second, Special Agent Justin Hines, a Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified about the circumstances surrounding the calls that led him to conclude that Mr. Davis was one of the voices on the calls. Special Agent Hines transported Mr. Davis from CFCF to the United States District Court courthouse, during which time he spoke to Mr. Davis for roughly 15 minutes. He also reviewed approximately 178 calls spanning the time when Mr. Davis was incarcerated at CFCF. He found that the voice of the person making the calls was consistent throughout and the person consistently called Mr. Davis' family members, including his brother Raheem Davis and mother Roslin Davis. The speaker on the calls referred to himself in the third person as Salim, referenced Mr. Davis' probation officer Kate McKenna, discussed erasing information from Mr. Davis' iPhone by logging in with Mr. Davis' e-mail address (which includes Mr. Davis' name and the speaker believed the password may have included Mr. Davis' mother's name). Although there were some edits from the first to final drafts of the transcripts of these calls, Special Agent Hines testified that they were non-material mistakes such as spelling and accurately reflected the recordings.

Although Mr. Davis hopes to sow doubt in the voice identification on the recordings by stating that he and his brother sound similar and that other inmates could have accessed his PP number, the Court concludes that the Government has met its burden on this issue. The Court is satisfied with the authenticity of the recordings themselves under *Starks*. As to the voice

identification of Mr. Davis, the Court concludes that all the evidence together is sufficient to convince a reasonable jury that Mr. Davis was the speaker on the calls. *Kaboni*, No. 07-550-03, 2013 WL 420334, at *6 ("Considered together, the evidence is sufficient to convince a reasonable jury by a preponderance of the evidence that [the defendant] is the speaker on the January 5, 2005. Accordingly, the Government has satisfied its burden under *Starks* and Rule 901."). "Any attacks by defendants on the accuracy of the identification go to the weight of the evidence, and will be for the jury to decide." *United States v. Stills*, No. 04-680-03, 2006 WL 1737496, at *2 (E.D. Pa. June 22, 2006).

## CONCLUSION

For the reasons set out in this memorandum, the Court denies Mr. Davis' motion to suppress and grants the Government's motion to admit audio recordings. An appropriate order follows.

BY THE COURT:

 /s/ Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE