## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | **No. 18-270** |
| **SALIM DAVIS** | : | |

## MEMORANDUM

PRATTER, J.                                        OCTOBER $\underline{2}$, 2020

Salim Davis moves for an acquittal under Rule 29 of the Federal Rules of Criminal Procedure and moves for a new trial under Rule 33. The Government opposes both post-trial motions. Because the motions raise substantially similar issues and involve the same facts, the Court considers both here. For the reasons that follow, the Court denies the motions.

### BACKGROUND

A federal grand jury returned a returned a four count Second Superseding Indictment charging Mr. Davis with one count of making a false statement to a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A), one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), one count of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), and one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Mr. Davis challenges these four counts in the pending motions.

The charges here involve conduct between October and December 2017. The Indictment described Mr. Davis's efforts to obtain a firearm through a straw purchase, given that a prior felony conviction barred him from legally purchasing and possessing a firearm. Mr. Davis directed Basiyr Kelly, who owed Mr. Davis a debt, to falsely certify that he (Mr. Kelly) was the actual

buyer. In December 2017, Mr. Davis fired that same loaded firearm—a Smith & Wesson .40 caliber—in broad daylight in a residential neighborhood in Philadelphia. At that time, Mr. Davis had over 70 Xanax pills and more than $1,000 cash on him.

The Court presided over a five-day trial in September 2019.[1] Following the close of the Government's case-in-chief, Mr. Davis moved for judgment of acquittal, which the Court took under advisement. Mr. Davis was found guilty on all counts.

Shortly after the verdict, Mr. Davis moved for an extension of time to file his post-trial motions. The Court granted him two extensions. The Government did not object to either request for additional time. Mr. Davis filed both of the pending motions on December 16, 2019.

## STANDARD OF REVIEW

Rule 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29. In considering a Rule 29 motion, the Court reviews the evidence in the light most favorable to the Government and draws all reasonable inferences in favor of the Government. *United States v. McKee*, 506 F.3d 225, 232 (3d Cir. 2007). The Court presumes that the jury properly evaluated the witnesses' credibility, "found the facts, and drew rational inferences." *United States v. Wasserson*, 418 F.3d 225, 237 (3d Cir. 2005). The Court must sustain the verdict "if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence." *United States v. Arden*, 2009 WL 1971392, at *2 (E.D. Pa. July 7, 2009), *aff'd*, 433 F. App'x 127 (3d Cir. 2011). Provided there is substantial evidence, the Court will not disturb the verdict. Indeed, the movant bears such a heavy burden

---

[1]    The trial was bifurcated: Counts One, Three, and Four were first tried and a verdict returned before proceeding to Count Two, the felon in possession charge. The jury returned both verdicts on September 20, 2019.

that acquittal should be confined to cases where the prosecution's failure is clear. *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984).

Under Rule 33, a court may vacate any judgment and grant a new trial if the interest of justice so requires. Fed. R. Crim. P. 33(a). A court evaluating a Rule 33 motion does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Even if the Court "believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Silveus*, 542 F.3d 993, 1004–05 (3d Cir. 2008). Motions for new trial based on sufficiency of the evidence are disfavored and should be granted "only in exceptional cases." *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

**DISCUSSION**

**I.    Sufficiency of the Evidence**

Because Mr. Davis raises the same sufficiency of evidence arguments in his motion for acquittal as his motion for a new trial, the Court evaluates these arguments under the higher Rule 33 standard.

**A.  Aiding and Abetting the Straw Purchase (Count One)**

Mr. Davis contests the sufficiency of the evidence with respect to his conviction for aiding and abetting the straw purchase of a firearm in violation of 18 U.S.C. § 924(a)(1)(A). The Government was required to prove (1) Mr. Kelly made a false statement to a federal firearms licensee; (2) Mr. Davis knew that the offense charged was going to be committed or was being committed by Mr. Kelly; (3) Mr. Davis knowingly did some act for the purpose of aiding Mr. Kelly

3

in committing the specific offense charged and with the intent that Mr. Kelly commit that specific offense; and (4) Mr. Davis performed an act in furtherance of the offense charged.

At trial, the Government presented testimony from Basiyr Kelly detailing his efforts to purchase a firearm and ammunition for Mr. Davis. Mr. Kelly testified that he owed Mr. Davis a debt and was pressured to repay that debt by purchasing the firearm for Mr. Davis.[2] Mr. Kelly described his visit to Double Action Incorporated, a firearm shop and gun range, in October 2017. There, he met Mr. Davis, who selected a firearm and supplied Mr. Kelly with the cash to make the purchase. Mr. Kelly testified that he knew he made a false statement to the federal firearms licensee when he indicated on the ATF Form that the firearm was for himself. The firearm indeed became Mr. Davis's and was recovered from him almost three months later.

In asserting that the evidence was insufficient to support a conviction on Count One, Mr. Davis argues that Mr. Kelly was an unreliable witness who admitted to false statements in proffer sessions with the Government and contradicted himself on the witness stand at trial. Mr. Davis contends that Mr. Kelly's testimony was essential to the Government's case such that absent his testimony, the Government could not prove this Count beyond a reasonable doubt.

As a threshold matter, credibility is a jury determination and for purposes of a motion for acquittal, the Court must presume the jury has properly carried out its function in evaluating Mr. Kelly as a witness. In addition, the Court instructed the jury about Mr. Kelly's role as a cooperating witness, his entry into a guilty plea agreement, and that his testimony should be considered with great care and caution. Mr. Kelly testified that he was initially fearful of the Government when they first questioned him at his home and admitted he was not initially truthful

---

[2]    Mr. Kelly testified that "[Mr. Davis] reached out to me. Like that's how he got the gun. I owed him. So me getting the gun was supposed to pay off my debts." Sept. 18 Trial Tr. 172:5–17.

4

with the Government.  As discussed below, the trial record reflects Mr. Kelly's confusion in distinguishing between a Springfield XD firearm—a firearm not involved in this case—and the Smith & Wesson gun he testified that he obtained for Mr. Davis.  Following Mr. Kelly's testimony, the Court permitted counsel to call Special Agent Hines and acknowledged that there was "probably some room for some clarification."  Special Agent Hines testified that his investigation revealed that on a separate occasion, Mr. Kelly purchased a Springfield XD pistol and asked Mr. Davis whether he knew of anyone who would be interested in buying it.  Special Agent Hines also noted that Mr. Kelly had purchased three, not two, firearms in the past.

Defense counsel cross-examined Mr. Kelly extensively about his earlier statements, his plea agreement and possible biases, and confusion over different gun purchases.  Mr. Kelly's testimony, to the extent there were contradictions or potential bias, was fully submitted to the jury to credit or reject.

Mr. Davis's second argument is even less availing:  Peter Cannella, the clerk at Double Action who signed the ATF Form for the Smith & Wesson firearm, testified that he did not recognize Mr. Davis on the day of the purchase.  Mr. Cannella described the thousands of customers who have visited Double Action in the past seven years he has worked there.  That Mr. Cannella could not recall Mr. Davis—a visitor from two years ago who did not purchase a firearm—but did recognize Mr. Kelly—who actually purchased the firearm in question—did not prevent the jury from finding Mr. Davis guilty on Count One.

Mr. Davis has not met his burden for an acquittal on Count One.[3]

---

[3]     The Court addresses Mr. Davis's contention that Mr. Kelly perjured himself at trial and accordingly should be granted a new trial in Section II.A., *infra*.

5

### B. Possession of Firearm and Ammunition (Count Two)

Mr. Davis also contends that the record was insufficient to establish that he possessed the firearm and ammunition in violation of 18 U.S.C. § 922(g). To establish a violation of felon in possession, the Government was required to prove (1) Mr. Davis knowingly possessed a firearm and ammunition; (2) Mr. Davis had been convicted previously of a felony offense and both knew of this previous conviction and that it was for a crime punishable by imprisonment of more than one year; and (3) Mr. Davis's possession of the firearm and ammunition was in or affecting interstate or foreign commerce.

At trial, the Government presented evidence that Mr. Davis possessed the firearm and ammunition. Inspector Johnson testified that he heard gunshots, then saw Mr. Davis and another individual pointing firearms. The inspector called for assistance and followed Mr. Davis to a nearby house at which point other officers arrived and recovered the weapon from Mr. Davis's jacket pocket. Inspector Johnson identified the firearm recovered from Mr. Davis as the same one he saw Mr. Davis holding. Mr. Davis challenges the Inspector's credibility based on his testimony the firearm was predominantly black and the Smith & Wesson gun at issue here had a steel slide. The Court is not persuaded by Mr. Davis's argument in the face of the overwhelming evidence, including the Inspector's eyewitness testimony that he saw Mr. Davis point a firearm within feet of the Inspector.

In addition to law enforcement eyewitness testimony, the Government introduced ballistics and DNA evidence, including four fired cartridge casings recovered from the scene. A firearms expert testified that these casings were fired from Mr. Davis's gun. A DNA expert testified that DNA recovered from the magazine of the firearm matched Mr. Davis's. And a gunshot residue expert testified there was residue present on Mr. Davis's jackets. Defense counsel cross-examined each of these experts about the limits of their opinions and conclusions.

6

As to the second element, Mr. Davis stipulated that he was aware of his previous felony conviction and that he knew it was illegal for him to possess a firearm. Finally, an interstate nexus expert provided testimony that the firearm and ammunition at issue traveled in interstate commerce to establish the third element.

Taken together, a reasonable jury could conclude that Mr. Davis was in possession of a firearm and ammunition. And although Mr. Davis raises various challenges to the experts' testimony,[4] the Court is not persuaded that the jury's verdict is contrary to the weight of the direct and circumstantial evidence submitted by the Government.

## C. Possession with Intent to Distribute Xanax (Count Three)

Mr. Davis also challenges his conviction for possession of a controlled substance with intent to distribute based on an argument of the insufficiency of the evidence. To establish that Mr. Davis violated 21 U.S.C. §§ 841(a), (b) the Government was required to prove beyond a reasonable doubt that: (1) Mr. Davis possessed a mixture or substance containing a controlled substance; (2) Mr. Davis possessed the controlled substance knowingly or intentionally; (3) Mr. Davis intended to distribute the controlled substance; and (4) the controlled substance was Alprazolam ("Xanax").

Mr. Davis does not dispute that he possessed Xanax. Rather, he argues that the lack of direct evidence of him dealing Xanax—whether from testimony from a confidential informant or from evidence of a controlled buy—precludes a finding that he had possession with intent to distribute.

---

[4] Mr. Davis argues that the DNA expert could not rule out the possibility that DNA was transferred to the firearm after officers searched his backpack then handled the handgun. However, the DNA recovered from the handgun was swabbed from the magazine—the compartment where bullets are loaded into the gun— and, according to the DNA expert, is exposed to fewer sources of contamination than the exterior of the gun.

7

"The prosecution may satisfy its burden entirely through circumstantial evidence." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010). Mr. Davis's own drug trafficking expert conceded that direct evidence of dealing is not necessary to show possession with intent to distribute, thus conceding that circumstantial evidence can suffice. Moreover, Mr. Davis did not object to the jury instruction on this Count, which makes clear that the Government is not obligated to present direct evidence from undercover agents, confidential informants, or controlled buys.

At trial, the Government introduced testimony from Special Agent Gerard Gobin, a veteran of law enforcement with 30 years of experience. Agent Gobin testified that the nearly 80 Xanax pills, the packaging, the presence of a handgun, and over $1,000 in cash on Mr. Davis, and his negative drug screens for the past two years were consistent with possession with intent to distribute. Mr. Davis's own drug expert, David Leff—with 40 years of experience—did not contradict Agent Gobin's testimony.

Mr. Davis argues that he possessed the Xanax for personal use given prior injuries. But the evidence showed that Mr. Davis had been tested 19 times for benzodiazepines (which includes Xanax) between October 2015 and November 2017. Of those 19 tests, he never tested positive for Xanax, certainly evidence that he was not using Xanax as he contended. To the extent Mr. Davis's mother testified that her son was prescribed pain medication, she admitted that she was unaware of whether Xanax was a pain medication and could not say that she ever saw Mr. Davis use Xanax. Mr. Davis also points to testimony from Dr. Kristin Conlon who evaluated Mr. Davis on two occasions in 2018, at which time Mr. Davis stated he used Xanax. The jury, however, was entitled to partially credit Dr. Conlon's testimony regarding Mr. Davis's mental health history while not crediting the eleventh hour explanation for carrying 80 pills only after he had been charged with possession with intent to distribute.

8

Based on the record evidence, a reasonable jury could find that Mr. Davis possessed Xanax with intent to distribute. There is no indication that a conviction on this charge was a miscarriage of justice which warrants a new trial.

## D. Possession of Firearm in Furtherance of a Drug Trafficking Crime (Count Four)

Mr. Davis also challenges his conviction for possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c), again based on insufficiency of the evidence. The Government was required to prove beyond a reasonable doubt that (1) Mr. Davis committed the crime of possession with intent to distribute a controlled substance as charged in Count Three and (2) Mr. Davis knowingly possessed a firearm in furtherance of this crime.

As described above, the Government produced sufficient evidence to meet its burden that Mr. Davis possessed a controlled substance with intent to distribute and Mr. Davis possessed the firearm. Mr. Davis specifically disputes that the evidence established that he possessed the firearm "in furtherance of" a crime. To be sure, under prevailing law, the "mere presence of a gun is not enough." *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004). Rather, there must be evidence that shows the defendant's possession "actually furthered the drug trafficking crime." *Id.*

The Third Circuit Court of Appeal's Model Jury Instructions list factors to assist in determining whether the possession of a firearm furthers a drug trafficking crime: the type of criminal activity; accessibility of the firearm; the type of firearm; whether the defendant possessed the firearm illegally; whether the firearm is loaded; the time and circumstances under which the firearm is found; and proximity to drugs or drug profits. 3d Cir. Crim. Model Jury Instructions § 6.18.924A-1. At trial, Inspector Johnson testified that he heard gunshots, and then saw Mr. Davis pointing a gun at another armed individual. Testimony established that Mr. Davis was actively firing a loaded gun in broad daylight in a residential Philadelphia neighborhood before placing the gun in his jacket pocket. When police officers apprehended Mr. Davis shortly thereafter, they

9

recovered the gun from his pocket, the Xanax pills, and over $1,000 in cash. As established, Mr. Davis previously was convicted of a felony offense—which he stipulated to—so he possessed the firearm illegally. Further, he came into possession of this particular firearm through a straw purchaser. And Mr. Davis's own expert conceded that drug dealers will typically carry a firearm to protect the drugs and their proceeds. Collectively, the jury could reasonably consider these factors satisfied, as does the Court.

For the foregoing reasons, this is not an "exceptional case" that warrants a new trial on the basis of the weight of the evidence.

## II.    Mr. Davis's Additional Grounds for a New Trial

In addition to the sufficiency of the evidence challenges raised in his Rule 29 motion, Mr. Davis's Rule 33 motion requests a new trial based on the Government's failure to correct Mr. Kelly's testimony, improper jury selection, and the Government's withholding of Mr. Kelly's prior proffer letter. The Court is satisfied that no miscarriage of justice occurred here and that the jury's verdict was consistent with the weight of the evidence.

### A. Failure to Correct Testimony

Mr. Davis asks for a new trial on the basis that the Government elicited false testimony from Mr. Kelly and did nothing to correct it. A defendant's due process rights are violated where the Government knowingly introduces perjured testimony to secure a conviction. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To the extent there is known false testimony, the Government is responsible for correcting it. But as the Third Circuit recently held in cases of uncorrected false testimony, "such a violation, if established, does not alone warrant a new trial; there must also be prejudice (or materiality)." *United States v. Williams*, No. 17-2111, 2020 WL 5422788, at \*17 (3d Cir. Sept. 10, 2020). To find a due process violation, Mr. Davis must establish (1) Mr. Kelly committed perjury; (2) the Government knew or should have known of the perjury; (3) the

testimony went uncorrected; and (4) there is a reasonable likelihood that the false testimony affected the verdict. *Id.*

Although the Court found Mr. Kelly's testimony in part confusing, the Court does not find that he perjured himself. Perjury is where a witness gives false testimony "with the willful intent to provide false testimony, *rather than as a result of confusion, mistake, or faulty memory.*" *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The trial record reflects Mr. Kelly's confusion while being cross-examined in distinguishing between a Springfield XD firearm—a firearm not involved in this case—and the Smith & Wesson gun he obtained for Mr. Davis in October 2017. Knowingly false testimony requires more than showing "mere inconsistencies in testimony by government witnesses." *United States v. Scarfo*, 711 F. Supp. 1315, 1322 (E.D. Pa. 1989), *aff'd sub nom. United States v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990). Defense counsel emphasizes that Mr. Kelly could not remember whether he purchased two or three firearms in the past—firearms which were not material to establishing the counts with which Mr. Davis was charged and which he (Mr. Kelly) purchased over two years ago.

On re-direct, Government specifically asked Mr. Kelly to clarify his statements about the Springfield XD pistol and whether it was that gun or the Smith & Wesson handgun he purchased for Mr. Davis. Mr. Kelly expressed his confusion regarding prior firearm purchases but was clear that he purchased the Smith & Wesson to pay off his debt to Mr. Davis. And Mr. Davis's counsel called Special Agent Hines to clarify Mr. Kelly's testimony about the number of prior firearm purchases, again not at issue here. The Court permitted the testimony, signaling for the jury that there was some room for clarification. A finding that Mr. Kelly did not commit perjury itself "preclude[s] a finding of constitutional error." *Lambert v. Blackwell*, 387 F.3d 210, 243 (3d Cir. 1976). Accordingly, the Court will not order a new trial on the basis of Mr. Kelly's testimony.

11

### B. Jury Selection

Mr. Davis next argues he is entitled to a new trial based on alleged improper jury selection, invoking *Batson v. Kentucky*, 476 U.S. 79 (1986). As an initial matter, the Court need not reach the substance of Mr. Davis's *Batson* claim: Mr. Davis failed to timely object to the Government's peremptory strike against a juror and, so doing, failed to preserve the claim. Instead, it was only after the Court had sworn in the jury and the Government was proceeding with opening statements that Mr. Davis objected to the makeup of the jury.

*Batson* did not specify when an objection must be made in order to be timely. *Ford v. Georgia*, 498 U.S. 411, 423 (1991). The Third Circuit Court of Appeals expresses that a *Batson* objection is timely when it is made as soon as possible or by the close of *voir dire*. *See, e.g.*, *Thompson v. Johnson*, 291 F. App'x 477, 479 (3d Cir. 2008) ("We have held that a *Batson* challenge must be made before the petit jury has been sworn and prior to the dismissal of the venire."); *United States v. Sharma*, 190 F.3d 220, 231 (3d Cir. 1999) (affirming judgment and finding defendants failed to make a timely challenge prior to the dismissal of the venire); *Gov't of Virgin Islands v. Forte*, 806 F.2d 73, 76 (3d Cir. 1986) (defendant waived claim because he failed to make any objection at the close of *voir dire*). That "only" 24 hours passed between jury selection and the start of trial does not save Mr. Davis's claim—Mr. Davis waited until after the jury was selected, the venire pool was dismissed, the jury was sworn in, and the Government was giving an opening statement.

But even if Mr. Davis's objection had been timely, the Court denies the *Batson* claim on the merits. First, the Court is not convinced that Mr. Davis made a *prima facie* showing of racially discriminatory peremptory strikes. Among the factors considered at the first step of the *Batson* analysis are the number of racial group members in the panel, the nature of the crime, the race of the defendant and the victim, a pattern of strikes against racial group members, and the

12

prosecution's questions and statements during the *voir dire*. *Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir. 1995). In the context of this case, Mr. Davis focuses on Juror 18. Juror 18 was a 30-year old resident of Philadelphia who worked at a mini-mart. He did not raise his hand in response to any of the Court's many questions during *voir dire*. Of the 41 prospective jurors in the pool, two were African-American and both were removed based on articulated bias, which the Court again reviewed when Mr. Davis raised his untimely *Batson* challenge at the start of trial.[5] A single strike against Juror 18 does not make a "pattern" sufficient to sustain a *Batson* challenge. On this basis, Mr. Davis has not made out a *prima facie* case against the Government and the burden does not shift to the Government.

Were the Court to reach the second step of the *Batson* analysis, the Court is satisfied that the Government offered a race-neutral explanation for striking Juror 18: he was inattentive to the Court's questions, which the Government found "concerning," and did not provide answers to any of the questions. Where the Government invokes a prospective juror's demeanor as a basis for the strike, the court's firsthand observations take on an even greater importance. *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). Following Mr. Davis's challenge, the Court informed the parties that based on its recollection and supervision of jury selection the day before, there was no reason to revisit the selection process. Accordingly, the Court will not grant a new trial on this basis.

## C. Non-Disclosure of Proffer Letter

Mr. Davis argues the Government violated his due process rights to receive exculpatory or impeachment evidence under *Brady* and *Giglio* by not disclosing the preliminary proffer letter it provided to Mr. Kelly. *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United* States, 405 U.S.

---

[5] Juror 12 was unable to commit to saying he would follow the law in the case. Juror 29 said she "didn't like courts," "don't like judging either," and "don't like to judge at all."

150 (1972). Although it withheld the proffer letter, the Government disclosed the formal plea agreement which superseded any prior earlier offers and which governed Mr. Kelly's cooperation.

As a general matter, the Government is under no "obligation under *Brady* or *Giglio* to disclose all drafts or versions of plea agreements, proffer letters or grants of immunity." *United States v. Miller*, 250 F.R.D. 588, 593 (D. Kan. 2008) ("To the extent defendants seek such, their motion is denied because they are entitled to only the final, operative plea agreement, proffer letter, or immunity agreement."); *accord United States v. Santisteban*, 501 F.3d 873 (8th Cir. 2007) ("Regardless of any preliminary proffer agreements, the formal plea agreement governed [the witness]'s cooperation, and it provided the jury with a sufficient basis for judging the credibility of [his] testimony at trial.").[6] Further, the prior proffer letter was merged into and superseded by the final executed plea agreement. *See* Gov't Ex. 48 at 10 ("It is agreed that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty plea agreement."); *United States v. Davis*, 393 F.3d 540, 546 (5th Cir. 2004); *United States v. Sedlak*, 2015 WL 1033981, at *22 (M.D. Pa. Mar. 10, 2015) ("[A]ny proffer agreement did not survive the merger clause in the plea agreement.").

Nor is Mr. Davis able to articulate any prejudice suffered: Mr. Davis was not prevented from cross-examining Mr. Kelly about his agreement with the Government or the statements he made during proffer sessions. The Government disclosed all reports summarizing Mr. Kelly's statements from those proffer meetings. Indeed, counsel not only extensively cross-examined Mr. Kelly as to his bias, he exacted multiple admissions that Mr. Kelly made false statements

---

[6]     Mr. Davis relies on *United States v. Toilolo*, a case inapposite to the facts here: there, the Government's failure to disclose the existence of any plea agreement with the cooperating witness constituted a *Giglio* violation. 2014 WL 1091715, at *6 (D. Haw. Mar. 17, 2014).

14

during his proffer meetings. The terms of Mr. Kelly's plea agreement and the contents of the summary reports were sufficient for Mr. Davis to put Mr. Kelly's potential bias before the jury and cast doubt on Mr. Kelly's credibility. The Court does not find Mr. Davis's due process rights were violated. To the extent there was any error, the Court finds it to be merely harmless, which does not entitle Mr. Davis to a new trial.

### CONCLUSION

For the reasons set out in this memorandum, the Court denies Mr. Davis's motions and enters the accompanying Order.

**BY THE COURT:**

**GENE E. K. PRATTER**
**UNITED STATES DISTRICT JUDGE**